UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

DAVID JOFFEE, CATHERINE STONE,
TERENCE KRUSKA, ROBERT J. BLUME,
AMALIA CONCIATORI, BOB EISELE,
SYLVIA S. EISELE, BARRY KEITH HERMAN,
ELLEN NYSTROM HERMAN, ALAN JAMES,
MARC A. KOEHLER, SHERRIE E. KOEHLER,
EDWARD B. LEINBACH, BRUCE LILES,
LINDA LILES, DAVID J. MILLER,
GENNUS MILLER, JEFFREY A. MORRIS,
SUZANNE N. MORRIS, LDX OPTRONICS, INC.,
JOHN R. MURPHY, SUELLEN C. MURPHY,
SUSAN C. MURPHY, TIMOTHY J. MURPHY,
RYAN J. MURPHY, STUART NEWBORN,
DIANE NEWBORN, JOHN POLONCHAK,
MYRTLE POLONCHAK, KURT SCHMITZ,
LESLIE SCHMITZ, JAMES SIMPSON,
RICHARD VAZQUEZ, JEFFREY R. ZAHN,
JAMES OLSON, KATHRYN OLSON,
RICHARD NORDEN, DENIS CROWTHER and
DARLENE CROWTHER,

                        Plaintiffs,

                                                04 Civ. 3507 (RWS)
        - against -
                                                O P I N I O N
LEHMAN BROTHERS, INC. KENNETH N.
GOLDMAN, M.D., and DAVID M. GRUBER, M.D.,

                        Defendants.
----------------------------------------X

A P P E A R A N C E S:

<u>Attorneys for Plaintiffs</u>:

        McCALLION & ASSOCIATES
        24 West 40th Street, 17th Floor
        New York, NY 10018
        By:  KENNETH F. McCALLION, ESQ.
                <u>Of Counsel</u>

        THOMAS A. HOLMAN, ESQ.
        One Penn Plaza, Suite 2505
        New York, NY 10119

        CURTIS V. TRINKO, ESQ.
        16 West 46th Street
        New York, NY 10036


CONTINUED ON FOLLOWING PAGE

<u>Attorneys for Defendants</u>:

JONES DAY
222 East 41st Street
New York, NY 10017
By:  JAYANT W. TAMBE, ESQ.
     AVIVA S. WARTER, ESQ.
     <u>Of</u> <u>Counsel</u>

**Sweet, D.J.,**

Defendants Lehman Brothers, Inc. ("Lehman"), Kenneth Goldman, M.D. ("Goldman") and David A. Gruber, M.D. ("Gruber") (collectively the "Defendants") have moved under Rules 12(b)(6) and 9(b), Fed. R. Civ. P., and the Private Securities Litigation Reform Act ("PSLRA") to dismiss the complaint of 37 individuals and subchapter 5 corporations (the "Plaintiffs"), alleging a fraudulent scheme to inflate the value of shares of Sunrise Technologies, Inc. ("Sunrise"), which were purchased by the Plaintiffs. For the reasons set forth below, the motion is granted.

## Prior Proceedings

The Plaintiffs filed their initial complaint on May 7, 2004. The Defendants moved to dismiss and the Plaintiffs filed the amended complaint and then the second amended complaint (the "SAC"), which is the subject of the instant motion. The Defendants' motion to dismiss the SAC was filed on November 9, 2004, and it was heard on January 26, 2005.

## The Facts

The following facts are drawn from the SAC, which includes "any documents incorporated in it by reference, annexed to it as an exhibit, or 'integral' to it because it 'relies heavily

upon [such document's] terms and effect.'" <u>Pollock v. Ridge</u>, 310
F. Supp. 2d 519, 524 (W.D.N.Y. 2004) (quoting <u>Chambers v. Time
Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotations
omitted)).  All well-pleaded allegations are accepted as true for
the purpose of this motion.  <u>See</u> <u>Chambers</u>, 282 F.3d at 152.  The
following statements do not constitute findings of the Court.

Lehman is a broker-dealer, a purchaser of Sunrise common
stock, and an investor through a private placement.  Goldman and
Gruber were Lehman securities analysts who covered Sunrise.

The Plaintiffs purchased Sunrise shares at unspecified
times between December 1999 through December 2001.  Twenty-four out
of the thirty-nine plaintiffs are alleged to have purchased Sunrise
stock beyond April 3, 2001, the date that Lehman ceased research
coverage of Sunrise.  None of the Plaintiffs were customers of
Lehman.

Between December 1999 and April 3, 2001, Goldman and
Gruber consistently maintained a "1-Buy" rating, Lehman's strongest
buy rating, and a $19-per-share target price[1] on Sunrise stock.  As
illustrated by Figure 1 below, stock price information from the Dow

---

[1]  It should be noted that during a three-week period in March
2001, Goldman and Gruber dropped the Sunrise target to $12 per
share.

Jones and Reuters news services[2] indicates that during this time period, the share price of Sunrise common stock dropped from a closing price of $12.87 on December 3, 1999 to a closing price of $1.43 on April 3, 2001.

**Figure 1: Closing Price of Sunrise Common Stock (Based on Price Information Provided by Dow Jones and Reuters)**



    **[2]**The Second Circuit has stated that "[a] district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment." <u>Ganino v. Citizens' Utilities Co.</u>, 228 F.3d 154, 167 n. 8 (2d Cir. 2000).

The Plaintiffs have identified seven Lehman research reports concerning Sunrise that are alleged to have contained material misrepresentation or omissions.

First, in a report dated June 2, 2000, Gruber wrote: "We expect a rapid ramp [sic] 2H00E with over 300% top line growth in 2001E. Investor sentiment turns positive as doctor interest in Sunrise technology grows and the potential for explosive growth seems achievable." (Declaration of Jayant W. Tambe dated November 8, 2004 ("Tambe Decl.") Ex. 3 at 1.)

Second, in a report dated August 7, 2000, Gruber and Goldman wrote that "[i]nterest among ophthalmologists remains high," and that "Hyperion LTK is approved for the reduction of up to 2.5 diopters of hyperopia in patients older than 40 years." (Id. Ex. 4 at 1,2.)

Third, in a report dated August 10, 2000, Gruber and Goldman wrote that projected sales of Sunrise's Hyperion laser device had been increased for the second half of 2000. (See id. Ex. 5 at 1.)

Fourth, in a report dated October 20, 2000, Goldman and Gruber wrote that Sunrise warranted a 1-Buy rating "due to the demonstrated high demand for the Hyperion laser units and early anecdotal evidence of high utilization." (Id. Ex. 6 at 1.) The

analysts further stated that "[w]e believe that Sunrise will meet our expectations of 115 unit sales by end of year ... ." (Id.)

Fifth, in a report dated October 25, 2000, Goldman and Gruber wrote: "We reiterate our 1-Buy rating ... due to the demonstrated high demand for the Hyperion laser units and early anecdotal evidence of high utilization that was evident at this week's [American Academy of Ophthalmology ("AAO")] meeting." (Id. Ex. 7 at 1.) The analysts also reiterated their projection that Sunrise would sell 115 Hyperion laser units by the end of 2000. (See id.)

Sixth, in a report dated November 17, 2000, Goldman stated that "doctors who already own Sunrise Hyperion lasers . . . appear[] enthusiastic about Sunrise LTK." (Id. Ex. 8 at 1.) This report also reiterated the projected sales of 115 units by the end of 2000. (See id.)

Seventh, in a report dated April 3, 2001, Goldman and Gruber stated that Sunrise was rated a "1-Strong Buy" and also stated that "Lehman Brothers is terminating coverage of Sunrise Technologies." (Id. Ex. 9 at 1.)

The SAC has alleged that the above-described statements were false and misleading because Lehman allegedly knew and failed to disclose the following facts: (1) that when the Sunrise laser device was used in accordance with the FDA-approved protocol,

patients experienced side effects such as induced astigmatism, early regression and unpredictability of vision correction, (2) that Goldman was told about the possibility of induced astigmatism by unnamed ophthalmologists at a meeting of ophthalmologists in Dallas in October 2000, (3) that an ophthalmologist advised Goldman that patients experienced early regression of effects after the laser procedure and that treating ophthalmologists were unable consistently to predetermine the degree of vision correction that resulted from the laser procedure, and (4) that in November 2000, Goldman told an unnamed investor by telephone that "all" the doctors at the October 2000 AAO meeting were "excited" with Sunrise.

The SAC has alleged that Lehman knew about, but failed to disclose, an agreement between Sunrise and U.S. Medical Corporation whereby U.S. Medical would purchase and distribute twenty Sunrise laser units in return for the purchase by Sunrise of 4% of the privately owned stock in U.S. Medical, which approximated the cost of the twenty units. Lehman allegedly also knew that expenditures for capital equipment by ophthalmologists were declining. The SAC alleged that this information, along with the limitations of the Hyperion laser, renders false Lehman's projection of sales of 115 units by the end of 2000. The SAC alleged that Lehman should have tempered its opinions and projections about Sunrise with warnings concerning the omitted information.

The SAC has alleged that in response to Lehman's reports, Sunrise's stock price would rise.  For example, on the November 16, 2000, Sunrise stock closed at $3.37 per share.[3]  (See Tambe Decl. Ex. 16 at 11.)  The following day, after the release of a Lehman report, Sunrise closed at $4.03.  (See id.)  There were other instances when the issuance of Lehman research reports allegedly caused increases in the price of Sunrise stock.  For example, the day before the June 2, 2000 report was issued, Sunrise closed at $9.71; by June 8, 2000, the closing price had climbed to $11.00.  (See id. at 10.)  The day before the October 20, 2000 report was issued, Sunrise closed at $5.31; during the seven days after the report was issued, Sunrise climbed to a closing price of $7.21 on October 31, 2000.  (See id. at 12.)

On April 28, 2003, consent orders were entered into between Lehman, the Securities and Exchange Commission ("SEC") and the Attorneys General of New York, Alabama, Utah and Connecticut and the National Association of Securities Dealers ("NASD").  These orders provided for the injunction of certain practices and the payment of $80 million by Lehman.  These orders describe Lehman's participation in a fraudulent scheme arising out of its investment banking and research functions.  Pursuant to this scheme, Lehman research analysts generated undeservedly positive coverage of

---

[3]It should be noted that In the seven days preceding the release of the November 17, 2000 report, Sunrise stock dropped from a closing price of $5.96 on November 8, 2000.  During this time, each day's closing price was lower than that of the previous day. (See Tambe Decl. Ex. 16 at 11.)

Lehman's investment banking clients in order to help secure additional investment banking fees from those clients. Lehman has acknowledged that this practice gave rise to conflicts of interest between its equity research function and its investment banking function.

The SAC alleged that Lehman participated in the public offering of Sunrise securities and invested in Sunrise and that Lehman made false and misleading statements during the period when the Plaintiffs were purchasing Sunrise shares. The SAC also alleged that Lehman disseminated false information resulting in fraud-on-the-market.

Based on these allegations, the SAC asserts four causes of action. Count I of the SAC alleges violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Count II alleges "controlling person" liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Count III alleges negligent misrepresentation, and Count IV alleges common law fraud.

**The Issue**

The resolution of the present motion hinges in large measure on whether the Plaintiffs have adequately alleged that

their losses were caused by Defendants' conduct.  This question --
i.e., what must be pled with respect to loss causation in order to
state a claim pursuant to Section 10(b) and Rule 10b-5 -- has been
considered by a number of courts in this circuit, and perfect
harmony has not been achieved among these decisions.  Compare
Emergent Capital Inv. Mgmt., L.C.C. v. Stonepath Group, Inc., 343
F.3d 189, 197 (2d Cir. 2003) (holding that mere allegations that
defendant's misrepresentation caused the price of a security to be
artificially inflated at the time of purchase by the plaintiff are
inadequate to satisfy the pleading requirements with respect to
loss causation), with Suez Equity Investors, L.P. v. Toronto-
Dominion Bank, 250 F.3d 87, 97-98 (2d Cir. 2001) (stating that
plaintiff may allege loss causation by alleging that "the
defendants' misrepresentations induced a disparity between the
transaction price and the true 'investment quality' of the
securities at the time of transaction").  The Supreme Court has
resolved this tension by holding that in order to allege loss
causation, it is not adequate for a plaintiff merely to allege that
the price paid for a security was inflated as a result of a
defendant's misrepresentations.  See Dura Pharmaceuticals, Inc. v.
Broudo, 125 S. Ct. 1627, 1631 (U.S. 2005).


     The revelations concerning the activities of securities
firms has presented the courts with difficult issues as those
injured by these practices seek redress.  The resolution of this
motion reflects that tension.

## The Relevant Standards

### A.    Rule 12(b)(6)

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Chambers, 282 F.3d at 152 (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001)).  The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000).

### B.    Rule 9(b)

A claim under section 10(b) sounds in fraud and must therefore meet the pleading requirements of Rule 9(b), Fed. R. Civ. P.  See, e.g., In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir. 2001).  Such a claim must also satisfy certain requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  See 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(2); see generally Novak v. Kasaks, 216 F.3d 300, 306-07 (2d Cir. 2000)

(setting forth the heightened pleading standards of the PSLRA that must be met by a plaintiff who alleges securities fraud under Section 10(b) and Rule 10b-5); <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1127 (2d Cir. 1994) (stating that "[s]ecurities fraud allegations under § 10(b) and Rule 10b-5 are subject to the pleading requirements of Rule 9(b)").

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). The Second Circuit "has read Rule 9(b) to require that a complaint [alleging fraud] '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" <u>Rombach v. Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004) (quoting <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993)).

## Discussion

### A.   The Action Is Not Time-Barred

Defendants argue that this action was not timely when filed on May 7, 2004. They argue that the applicable statute of limitations began to run, at the latest, on April 6, 2001 and that

the last day on which this action could have been brought was April 6, 2002.

Pursuant to Section 804 of the Public Company Accounting Reform and Investor Protection Act of 2002 (the "Sarbanes-Oxley Act"), Pub. L. No. 107-204, 116 Stat. 745 (2002), a complaint filed on or after July 30, 2002 asserting a private securities fraud claim "may be brought no later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). "'Discovery of facts for the purposes of this statute of limitations includes constructive or inquiry notice, as well as actual notice.'" Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003) (quoting Rothman v. Gregor, 220 F.3d 81, 96 (2d Cir. 2000) (internal quotation marks omitted)). The limitations period in Sarbanes-Oxley applies both to claims brought pursuant to sections 10(b) and 20(a) of the Exchange Act. See, e.g., Marcus v. Frome, 329 F. Supp.2d 464, 475 (S.D.N.Y. 2004); see also Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 n.2 (2d Cir. 1993) (stating that a section 20 claim based on a 10(b) violation is governed by the 10(b) statute of limitations).

The Second Circuit has held that Section 804 of the Sarbanes-Oxley Act does not function retroactively, and, therefore, it cannot revive claims that were stale as of July 30, 2002, the date of Sarbanes-Oxley's enactment. See Enterprise Mortg.

12

<u>Acceptance Co., LLC, Securities Litigation v. Enterprise Mortg.</u>

<u>Acceptance Co.</u>, 391 F.3d 401, 406 (2d Cir. 2004).

Prior to the enactment of Sarbanes-Oxley,

> [t]he statute of limitations for claims pursuant to
> section 10(b) of the Securities Exchange Act and SEC Rule
> 10b-5 [was] "within one year after the discovery of the
> facts constituting the violation and within three years
> after such violation." 15 U.S.C. § 78i(e) (2000).
> "Discovery of facts for the purposes of this statute of
> limitations includes constructive or inquiry notice, as
> well as actual notice." <u>Rothman v. Gregor</u>, 220 F.3d 81,
> 96 (2d Cir. 2000) (internal quotation marks omitted); <u>see
> also</u> <u>Dodds v. Cigna Sec., Inc.</u>, 12 F.3d 346, 350 (2d Cir.
> 1993). "A plaintiff in a federal securities case will be
> deemed to have discovered fraud for purposes of
> triggering the statute of limitations when a reasonable
> investor of ordinary intelligence would have discovered
> the existence of the fraud." <u>Dodds</u>, 12 F.3d at 350.

<u>Newman</u>, 335 F.3d at 193.

According to the Defendants, Plaintiffs' federal
securities fraud claims (<u>i.e.</u>, Counts I and II of the SAC) are
time-barred because by April 6, 2001, the Plaintiffs had inquiry
notice[4] of the facts constituting the alleged violation of section

---

[4]According to the Defendants, the following publicly
disseminated documents provided Plaintiffs with inquiry notice of
the conduct giving rise to their federal securities fraud claims:
(1) Sunrise' Form 8-K statements filed with the SEC on January 14,
2000, July 17, 2000, and January 31, 2001 (<u>see</u> Tambe Decl. Exs. 11,
12, and 14); (2) Sunrise' 10-Q statement filed with the SEC on
November 14, 2000 (<u>see</u> <u>id.</u> Ex. 13); (3) Sunrise' 10-K statement
filed with the SEC on April 6, 2001 (<u>see</u> <u>id.</u> Ex. 15); (4) an
October 25, 2000 research report by Goldman and Gruber (<u>see</u> <u>id.</u> Ex.
7) and a November 17, 2000 report written by Goldman (<u>see</u> <u>id.</u> Ex.
8); and (5) an approval letter from the FDA to Sunrise dated June
30, 2000 (<u>see</u> <u>id.</u> Ex. 10).

10(b). According to the Defendants, these public documents, taken together, constituted "storm warnings" that triggered a duty on the part of the Plaintiffs to investigate whether a 10(b) claim existed. See Arduini/Messina P'ship v. Nat'l Med. Fin. Serve. Corp., 74 F. Supp. 2d 352, 358-59 (S.D.N.Y. 1999) (holding that a company's investors had inquiry notice of securities fraud claims where public documents disclosed: (1) that the company's chief executive had made a $3,000,000 payment to a market maker to tout the company's stock; (2) that a significant amount of the company's revenue was generated by soon-to-expire contracts with entities controlled by the company's chief executive; and (3) that the chief executive had recently sold some $5,000,000 of the company's stock); de la Fuente v. DCI Telecomm., Inc., 206 F.R.D. 369, 382-383 (S.D.N.Y. 2002) (holding that investors had inquiry notice of a fraud claim against a company's auditor where (1) the company made public disclosures concerning its accounting practices and restated its audited financial statements; (2) the SEC had suspended trading in the company's stock for ten days because of accounting irregularities; and (3) the company's stock had lost 76% of its value) (citing Tregenza v. Great Am. Comm. Co., 12 F.3d 717, 720 (7th Cir. 1993) (stating that inquiry notice was triggered where stock described as "undervalued" lost 90 percent of its value within one year).)

As their fact patterns suggest, Arduini/Messina, de la Fuente and Tregenza are exceptions to the general rule that

14

"[w]hether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 168 (2d Cir. 2005) (internal quotation marks omitted) (holding that news reports raising general questions about conflicts of interest between defendant's equity research function and its investment banking function did not give investors inquiry notice that the defendant had issued fraudulent research reports in order to artificially inflate the stock price of certain of its investment banking clients); see also In re Sumitomo Copper Litig., 104 F. Supp. 2d 314, 324 (S.D.N.Y. 2000) (stating that defendant seeking dismissal on the grounds that plaintiff had inquiry notice of the claim and that the statute of limitations has run bears an "extraordinary" burden) (quoting In re Prudential Securities Inc., Ltd. Partnerships Litig., 930 F. Supp. 68, 76 (S.D.N.Y. 1996)).

Moreover, the issue of when Plaintiffs were put on inquiry notice and whether a reasonable inquiry could have revealed enough information to satisfy the heightened pleading requirements imposed pursuant to Rule 9(b) and the PSLRA, raise factual disputes which have been held to be inappropriate for disposition on a motion to dismiss. See Levitt v. Bear Stearns & Co., Inc., 340 F.3d 94, 104 (2d Cir. 2003). In the statute of limitations context, a Rule 12(b)(6) dismissal is appropriate only if the complaint, on its face, clearly shows that the claim is time-

barred.  See Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999).

Even if the published reports could be considered "storm warnings," the SAC alleged that subsequent Sunrise research reports by Goldman and Gruber were calculated to allay any concerns among investors that the published reports might have given rise to.  The Second Circuit has stated that "there are occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management."  LC Capital Partners, LP v. Frontier Insurance Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003) (citing Milman v. Box Hill Systems Corp., 72 F. Supp.2d 220, 229 (S.D.N.Y. 1999) (stating that "courts have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements").  Such statements of reassurance are adequate to deprive an investor of inquiry notice of a securities fraud claim if "an investor of ordinary intelligence would reasonably rely on the statements to allay [that] investor's concern."  LC Capital Partners, 318 F.3d at 154.

In support of their argument that Plaintiffs had inquiry notice by April 6, 2001 at the latest, Defendants assert that generalized claims concerning conflicts of interest at Lehman and other securities firms had been widely reported in the financial

16

press as early as August 2000. However, as a general rule, such reports are not adequate to give rise to inquiry notice. See, e.g. Fogarazzo v. Lehman Bros., Inc., 341 F. Supp. 2d 274, 276 (S.D.N.Y. 2004) (stating that "[f]or limitations purposes, investors were not charged with constructive knowledge of securities fraud when media reports gave generalized indications of investment banks' analysts' conflicts of interest").

Moreover, the SAC has properly alleged that until the settlement of the charges brought against Lehman by the SEC, the NASD and the Attorneys General on April 28, 2003, the Plaintiffs had no knowledge of the alleged practices of Lehman involving their security analysts' reports and the link to Lehman's investment banking business. It was those practices which are alleged to provide the required scienter for the Plaintiffs' securities claim.

This Court recently observed, in an analogous context, that "[t]o satisfy Rule 9(b) and the PSLRA, the Plaintiffs must plead particular facts supporting their theory that the Defendants' [inaction] was due to something nefarious, rather than simply imperfect economic forecasting." In re Aegon N.V. Securities Litigation, No. 03 Civ. 0603 (RWS), 2004 WL 1415973, at *8 (S.D.N.Y. June 23, 2004).

Although at least seven Sunrise reports in 2000 and 2001 are alleged to have falsely recommended that Sunrise securities was

a strong buy with a price target of $19, Plaintiffs have properly alleged that they could not have pled that Lehman's reports were part of a fraudulent scheme until they learned of the April 28, 2003 Global Settlement. Plaintiffs' allegations that Defendants were motivated by such concrete pecuniary benefits are necessary to meet the scienter requirements under the PSLRA. See In re WorldCom, 294 F. Supp. 2d 392, 425 (S.D.N.Y. 2003).

Based on the foregoing, it is determined that the Plaintiffs have adequately alleged that they may not have had inquiry notice of their securities fraud claims until April 28, 2003. Therefore, Counts I and II of the SAC cannot be judged untimely as a matter of law.

### B. The SAC Fails To State A Claim Pursuant to Section 10(b) and Rule 10b-5

Count I of the SAC alleges that the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5. Section 10(b) provides in pertinent part as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange --
> . . .
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such

18

rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b-5 provides in pertinent part as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"The language of Section 10(b) and Rule 10b-5 does not explicitly create a private right of action. In fact, the legislative history fails to indicate whether Congress even contemplated creating such a right. . . . Nevertheless, courts long have held that a private right of action was indeed created." Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp., 369 F.3d 27, 31 (2d Cir. 2004).

To state a claim for relief under Section 10(b) and Rule 10b-5, Plaintiffs must allege with requisite particularity that Defendants: "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." <u>In re IBM Securities Litigation</u>, 163 F.3d 102, 106 (2d Cir. 1998).

Defendants have moved for dismissal of Plaintiffs' claim pursuant to Section 10(b) and Rule 10b-5 on the grounds that Plaintiffs have failed to adequately allege (1) loss causation, (2) falsity, and (3) scienter.

### <u>1. The SAC Fails To Allege Loss Causation</u>

To state a claim pursuant to section 10(b) and Rule 10b-5, Plaintiffs must properly allege both transaction causation and loss causation. <u>Lentell</u>, 396 F.3d at 172. As the Second Circuit has stated:

> Causation in [the 10b-5] context has two elements: transaction causation and loss causation. <u>See Schlick v. Penn-Dixie Cement Corp.</u>, 507 F.2d 374, 380-381 (2d Cir. 1974). Loss causation is causation in the traditional "proximate cause" sense -- the allegedly unlawful conduct caused the economic harm. <u>See id.</u> at 380. Transaction causation means that "the violations in question caused the appellant to engage in the transaction in question." <u>See id.</u> at 380. Transaction causation has been analogized to reliance. <u>See Currie v. Cayman Resources Corp.</u>, 835 F.2d 780, 785 (11th Cir. 1988).

AUSA Life Ins. Co. v. Ernst and Young, 206 F.3d 202, 209 (2d Cir. 2000). Here, the Defendants argue that the Plaintiffs have failed to allege loss causation.

Defendants argue that the Second Circuit has held that an allegation of price inflation alone is not enough to establish loss causation. See Lentell, 396 F.3d at 175; Emergent Capital, 343 F.3d at 198; see also Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992).

The Plaintiffs do not address the loss causation pleading requirements imposed by the Emergent court. Instead, they cite other cases from this circuit -- Suez Equity, 250 F.3d at 95; DeMarco v. Robertson Stephens Inc., 318 F. Supp. 2d 110, 122-23 (S.D.N.Y. 2004); In re Initial Public Offering Sec. Litig., 297 F. Supp. 2d 668, 675 (S.D.N.Y. 2003); and In re WorldCom, 294 F. Supp. 2d at 413 -- to support their assertion that the SAC properly pled loss causation.

The Supreme Court's recent decision in Dura Pharmaceuticals is dispositive. See Dura Pharmaceuticals, 125 S. Ct. at 1631 (holding that in order to allege loss causation, it is not adequate for a plaintiff merely to allege that the price paid for an equity security was inflated as a result of defendant's misrepresentation). The Dura court stated:

Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will <u>sometimes</u> play a role in bringing about a future loss. It may prove to be a necessary condition of any such loss, and in that sense one might say that the inflated purchase price suggests that the misrepresentation (using language the Ninth Circuit used) "touches upon" a later economic loss. [<u>Broudo v. Dura Pharmaceuticals, Inc.</u>, 339 F.3d 933, 938 (9th Cir. 2003)]. But, even if that is so, it is insufficient. To "touch upon" a loss is not to <u>cause</u> a loss, and it is the latter that the law requires. 15 U.S.C. § 78u-4(b)(4).

<u>Id</u>. at 1632. The <u>Dura</u> court reasoned that its loss causation pleading requirement struck the proper balance between the policy interests animating the notice pleading system and those animating the federal securities statutes. The <u>Dura</u> court stated:

We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff. <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 513-515 (2002). But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the [federal securities statutes] seek to avoid. <u>Cf</u>. H.R. Conf. Rep. No. 104-369, p. 31 (1995) (criticizing "abusive" practices including "the routine filing of lawsuits ... with only a faint hope that the discovery process might lead eventually to some plausible cause of action"). It would permit a plaintiff "with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an <u>in terrorem</u> increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence." <u>Blue Chip Stamps</u>, 421 U.S. at 741. Such a rule would tend to transform a private securities action into a partial downside insurance policy. <u>See</u> H.R. Conf. Rep. No. 104-369; at 31; <u>see also</u> [<u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 252] (White, J., joined by O'Connor, J., concurring in part and dissenting in part).

Id. at 1634.

The SAC contained no allegations of a causal connection between the alleged misrepresentations and a subsequent economic loss suffered by the Plaintiffs. Rather, the SAC merely alleged that (1) Sunrise stock is publicly traded and (2) that the Defendants' misrepresentations falsely inflated the value of Sunrise' shares. The Dura court rejected the proposition that such allegations are adequate to plead loss causation. See id. at 1629-30 (stating that allegation that "'[i]n reliance on the integrity of the market, [the plaintiffs] ... paid artificially inflated prices for [defendant's] securities' and th[at] plaintiffs suffered 'damage[s]' thereby" were not adequate to plead loss causation).

Based on the foregoing, it is determined that Plaintiffs have not properly alleged loss causation.

## 2.   **The SAC Has Adequately Alleged Falsity**

Defendants assert that Plaintiffs have failed to properly plead the first element of their Section 10(b) and Rule 10b-5 claim (i.e., that Defendants made misstatements or omissions of material fact).

With respect to this element, the PSLRA provides that "the complaint [must] specify each statement alleged to have been

23

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Under proper circumstances, misstatements of opinion, (i.e., statements of opinion that are significantly at odds with that which the declarant actually believes to be true) can give rise to liability pursuant to Section 10(b) and Rule 10b-5. See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1991); Lentell, 396 F.3d at 177 (stating that "'systematically overly optimistic' [stock] ratings of the type published by [defendant's equities analysts] are [not] categorically beyond the reach of the securities laws"); Novak, 216 F.3d at 315 (holding that defendants' statements that "the[ir] inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true" was actionable pursuant to Section 10(b) and Rule 10b-5); Fogarazzo, 341 F. Supp. 2d at 295 (S.D.N.Y. 2004) (holding that plaintiffs had properly alleged that defendants had made misleading statements where it was specifically alleged (1) that the defendant investment banks used equity research to obtain and/or maintain investment banking business, (2) that defendants caused their research analysts to maintain positive coverage of specified stocks in order to obtain/maintain investment banking business, (3) that analysts' independence was thereby compromised, (4) that the

defendants failed to adequately supervise the analysts to ensure independence, and (5) that as a result of such practices, the defendant and its analysts caused the price of a given stock to become artificially inflated); DeMarco, 318 F. Supp. 2d at 117 (stating that "liability under § 10(b) can be predicated on statements of opinion, where it can be shown not merely that a proffered opinion was incorrect or doubtful, but that the speaker deliberately misrepresented his actual opinion").

As described above, the SAC specifically identified each statement alleged to be misleading, and it explained why each such statement was regarded as misleading. The SAC has alleged that Lehman maintained a practice that linked analysts' compensation to their willingness to generate favorable reports on the securities of investment banking clients. It is further alleged "that the analysts' views of the securities they covered were the exact opposite of what they recommended to the public." (SAC ¶ 99.) These disparities are described with particularity. The Plaintiffs have also alleged that the Sunrise research reports at issue omitted material information and that the omissions made the reports false and misleading. The omitted information included the facts surrounding the sale of units by U.S. Medical, the relationship between the Sunrise research reports and the Lehman investment banking as revealed in the Global Settlement (see SAC ¶ 103), and deficiencies in the operation of Sunrise units as reported in meetings of ophthalmologists. (see SAC ¶ 114.)

Based on the foregoing, it is determined that the SAC has properly alleged that the statements at issue were false and misleading.


3.  **The SAC Has Adequately Alleged Scienter**


Pursuant to the PSLRA and Second Circuit precedent, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); see also Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996) (quoting Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995)).  The Plaintiffs can satisfy this scienter requirement in one of two ways: (1) by alleging facts that demonstrate that the Defendants had motive and opportunity to commit fraud or (2) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  Kalnit v. Eichler, 264 F.3d 131, 138-39 (2d Cir. 2001).


"In general, a strong inference of scienter 'may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to

monitor.'" <u>Fogarazzo</u>, 341 F. Supp. 2d at 295 (quoting <u>Novak</u>, 216 F.3d at 311 (citations omitted)).

The SAC has alleged with specificity that several divisions at Lehman -- the research division, the investment banking division, and the firm's administration -- were actively encouraging the research division to publish misleading analyst reports for the purpose of promoting companies from whom Lehman hoped to earn additional investment banking fees. The details of this improper arrangement between Lehman's divisions is further described in the Global Settlement. Defendants argue that these allegations do no more than charge Lehman with a <u>modus</u> <u>operandi</u> of preparing and disseminating tainted analysts reports, and that such allegations are inadequate to allege motive and opportunity with requisite particularity. However, courts of this district have held that allegations of this sort are adequate to plead scienter. <u>See</u>, <u>e.g.</u>, <u>Fogarazzo</u>, 341 F. Supp. 2d at 297. As the <u>Fogarazzo</u> court stated:

> It is true that some of the most specific allegations of scienter in the complaint do not pertain to RSL [<u>i.e.</u>, the stock in which the plaintiffs invested], but rather to other companies that the Banks dealt with. The Banks argue that this is a basis for concluding that plaintiffs have not sufficiently alleged scienter. However, even where the heightened pleading standards of the PSLRA and Rule 9(b) are concerned, a court is directed to draw every inference in favor of plaintiffs on a motion to dismiss. Here, plaintiffs have alleged wide-spread conflicts of interest between the analyst and investment banking departments at three major Banks. They have made specific allegations -- based on, among other things,

e-mails from the Banks' own analysts -- suggesting that the Banks received investment banking business in return for favorable analyst coverage, as part of a standard industry practice.  Moreover, they have alleged that the Banks' relationship with RSL was the same as with these other companies -- the Banks issued positive research reports on the heels of new investment banking business and in the face of overwhelming information calling into question RSL's financial health.  Taken together, I can easily infer that the Banks' relationships with RSL were subject to the same conditions as with other companies. That being so, plaintiffs have amply pleaded facts giving rise to a strong inference that the Banks made the alleged misstatements with scienter.

Id. citations omitted).


Here, as in _Fogarazzo_, scienter has been properly alleged.  Plaintiffs have provided detailed allegations (1) that Lehman engaged in a general practice of providing unduly positive research coverage to certain of its clients in order to obtain additional investment banking fees, (2) that Sunrise was one of Lehman's investment banking clients, (3) that certain Sunrise research reports issued by Lehman contained statements that were false and misleading, and (4) that the analysts covering Sunrise were in possession of specific information that irreconcilably contradicted the statements contained in their research reports. Taken together, these allegations satisfy the pleading requirements with respect to scienter.

C.  **The SAC Fails To State A Claim Pursuant to Section 20(a)**

Section 20(a) of the Exchange Act provides in pertinent part as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable ... to the same extent as such controlled person ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Since Plaintiffs have failed to state a claim pursuant to Section 10(b) and Rule 10b-5, it necessarily follows that they have also failed to state a claim pursuant to Section 20(a). See Rombach, 355 F.3d at 177-78.

D.  **The SAC Has Failed To State A State Law Claim**

The parties do not dispute that the common law claims asserted in Counts III and IV of the SAC are governed by the law of New York state.

1.  **The Negligent Misrepresentation Claim**

Count III of the SAC alleges negligent misrepresentation. Under New York law, the elements of a claim for negligent misrepresentation are that:

(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

Greenberg v. Chrust, 198 F. Supp. 2d 578, 584 (S.D.N.Y. 2002) (citing Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir.2000)).

New York's Martin Act grants the Attorney General the power to regulate fraud and deception in the sale of securities. See N.Y. Gen. Bus. Law § 352-c.[5] The New York Court of Appeals has

---

[5] Section 352-c of the Martin Act provides in pertinent part as follows:
    It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to use or employ any of the following acts or practices:
    (a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
    (b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
    (c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made; where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, as defined in section three hundred fifty-two of this article, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.
N.Y. Gen. Bus. Law § 352-c. It should be noted that Section 352-c does not does not require proof of intent to defraud or scienter.

held that there is no implied private right of action pursuant to the anti-fraud provisions of the Martin Act. See CPC Intern. Inc. v. McKesson Corp., 70 N.Y.2d 268, 276, 519 N.Y.S.2d 804, 807, 514 N.E.2d 116, 118 (1987). With respect to McKesson's effect on negligent misrepresentation claims and other common law causes of action, it has been stated that:

> [i]n precluding a private right of action under the Martin Act the McKesson court did not explicitly discuss the effect of the Act on the common law, but in the years following McKesson three of the appellate divisions interpreting the decision held that the Martin Act preempts any common law claims within its purview. These courts generally held that allowing private litigants to press common law claims "covered" by the Martin Act would upset the Attorney General's exclusive enforcement power in exactly the same way that it would upset the exclusive enforcement power to allow private claims pleaded under the Martin Act itself.

Nanopierce Technologies, Inc. v. Southridge Capital Management LLC, No. 02 Civ. 0767 (LBS), 2003 U.S. Dist. LEXIS 15206, at *6-7 (S.D.N.Y. Sep. 2, 2003) (citing Whitehall Tenants Corp. v. Estate of Olnick, 213 A.D.2d 200, 201, 623 N.Y.S.2d 585, 585 (1st Dep't), appeal denied, 86 N.Y.2d 704, 631 N.Y.S.2d 608, 655 N.E.2d 705 (1995); Breakwaters Townhomes Ass'n of Buffalo, Inc. v. Breakwaters of Buffalo, Inc., 207 A.D.2d 963, 964, 616 N.Y.S.2d 829, 829 (4th Dep't 1994); Rego Park Gardens Owners, Inc. v. Rego Park Gardens Assocs., 191 A.D.2d 621, 622, 595 N.Y.S.2d 492, 494 (2d Dep't 1993); Eagle Tenants Corp. v. Fishbein, 182 A.D.2d 610, 611, 582 N.Y.S.2d 218, 219 (2d Dep't 1992); Horn v. 440 E. 57th Co., 151 A.D.2d 112, 119, 547 N.Y.S.2d 1, 5 (1st Dep't 1989)).

The Second Circuit has interpreted <u>McKesson</u> as barring breach of fiduciary duty claims and, presumably, other common law causes of action that are within the Martin Act's purview. <u>See</u> <u>Castellano v. Young & Rubicam, Inc.</u>, 257 F.3d 171, 190-91 (2d Cir. 2001). This rule has also been adopted by the majority of the district courts that have considered the effect of <u>McKesson</u> on common law claims. <u>See</u>, <u>Nanopierce</u>, 2003 U.S. Dist. LEXIS 15206, at *9 (collecting cases).

To be sure, there is at least some authority in this district to support a contrary view. <u>See</u> <u>Cromer Fin. Ltd. v. Berger</u>, Nos. 00 Civ. 2284 (DLC), 00 CIV. 2498 (DLC), 2001 U.S. Dist. LEXIS 14744, at *13-14 (S.D.N.Y. Sept. 20, 2001) (stating (1) that the New York Court of Appeals has not determined whether the Martin Act preempts common law claims and (2) that there is a split of authority among those intermediate appellate courts that have considered the issue) (citing <u>Scalp & Blade, Inc. v. Advest, Inc.</u>, 281 A.D.2d 882, 722 N.Y.S.2d 639, 640 (4th Dep't 2001) (stating that "nothing in the Martin Act, or in the Court of Appeals cases construing it, precludes a plaintiff from maintaining common-law causes of action based on such facts as might give the Attorney-General a basis for proceeding civilly or criminally against a defendant under the Martin Act.")).

However, the <u>Cromer Finance</u> and <u>Scalp & Blade</u> courts represent minority views. The rule adopted by the majority of state intermediate appellate courts that have considered the issue is that claims for negligent misrepresentation, which do not require a plaintiff to plead and prove intentional deceit, are covered by the Martin Act and cannot be asserted by private litigants. "[P]rinciples of federalism and respect for state courts' interpretation of their own laws counsel against ignoring the[se] rulings . . . ." <u>Castellano</u>, 257 F.3d at 190.

Based on the foregoing, the negligent misrepresentation claim is dismissed.

## 2. <u>The Fraud Claim</u>

Count IV of the complaint alleges common law fraud. Under New York law, the elements of a fraud claim are: (1) that the defendant made a material false representation, (2) that the defendant intended to defraud the plaintiff thereby, (3) that the plaintiff reasonably relied upon the representation, and (4) that the plaintiff suffered damage as a result of such reliance. <u>Manning v. Utils. Mut. Ins. Co.</u>, 254 F.3d 387, 400 (2d Cir. 2001) (quoting <u>Bridgestone/Firestone, Inc. v. Recovery Credit Servs.</u>, 98 F.3d 13, 19 (2d Cir. 1996)); <u>see also</u> <u>Lama Holding Co. v. Smith Barney, Inc.</u>, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370, 1373 (1996).

As an initial matter, it should be noted that the Martin Act does not preclude private litigants from bringing common law fraud claims because such claims require a plaintiff to prove intent or scienter.   Therefore, courts allow these claims to proceed while simultaneously dismissing negligent misrepresentation and breach of fiduciary duty claims.   See, e.g., Whitehall, 213 A.D.2d 200, 623 N.Y.S.2d 585.

The pleading requirements for common law fraud are essentially the same as those for claims under Section 10(b) and Rule 10b-5.  Nanopierce Technologies, Inc. v. Southridge Capital Management LLC, No. 02 Civ. 0767(LBS), 2004 U.S. Dist. LEXIS 24168, at *34 (S.D.N.Y. Dec. 2, 2004); Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co., No. 02 Civ. 1230 (LMM), 2004 U.S. Dist. LEXIS 9100, at *5-6 (S.D.N.Y. May 20, 2004); Spencer Trask Software & Info. Servs. LLC v. Rpost Int'l, Ltd., No. 02 Civ. 1276 (PKL), 2003 U.S. Dist. LEXIS 946, 61-60 (S.D.N.Y. Jan. 24, 2003); Internet Law Library, Inc. v. Southridge Capital Mgmtl, LLC., 223 F. Supp. 2d 474, 489 (S.D.N.Y. 2002); The Pits, Ltd. v. American Express Bank Intern., 911 F. Supp. 710, 719 (S.D.N.Y. 1996).   The special pleading requirements of Rule 9(b) apply to allegations of common law fraud.  See, e.g., Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 576 (2d Cir. 1969); Granite Partners, L.P. v. Bear, Stearns & Co. Inc., 17 F. Supp. 2d 275, 286 (S.D.N.Y. 1998).

Here, Plaintiffs have failed to plead loss causation (i.e., proximate cause) with requisite particularity. Absent such allegations of proximate cause, no common law fraud claim can be stated. See Citibank N.A., 968 F.2d at 1496-97 (affirming dismissal of a common law fraud claim where the plaintiff failed to adequately allege that the damages were proximately caused by the defendants' misrepresentations).

Based on the foregoing, Plaintiffs' common law fraud claim is dismissed.

## Conclusion

For the reasons set forth above, the complaint is dismissed in its entirety. The Plaintiffs are granted leave to replead within twenty (20) days of the entry of this order.

It is so ordered.

Dated:  New York, NY
June      23    , 2005

ROBERT W. SWEET
U.S.D.J.