```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X

DAVID JOFFEE, CATHERINE STONE,
TERENCE KRUSKA, ROBERT J. BLUME,
AMALIA CONCIATORI, BOB EISELE,
SYLVIA S. EISELE, BARRY KEITH HERMAN,
ELLEN NYSTROM HERMAN, ALAN JAMES,
MARC A. KOEHLER, SHERRIE E. KOEHLER,
EDWARD B. LEINBACH, BRUCE LILES,
LINDA LILES, DAVID J. MILLER,
GENNUS MILLER, JEFFREY A. MORRIS,
SUZANNE N. MORRIS, LDX OPTRONICS, INC.,
JOHN R. MURPHY, SUELLEN C. MURPHY,
SUSAN C. MURPHY, TIMOTHY J. MURPHY,
RYAN J. MURPHY, STUART NEWBORN,
DIANE NEWBORN, JOHN POLONCHAK,
MYRTLE POLONCHAK, KURT SCHMITZ,
LESLIE SCHMITZ, JAMES SIMPSON,
RICHARD VAZQUEZ, JEFFREY R. ZAHN,
JAMES OLSON, KATHRYN OLSON,
RICHARD NORDEN, DENIS CROWTHER and
DARLENE CROWTHER,
```



                    Plaintiffs,

                                            04 Civ. 3507 (RWS)
    - against -
                                            O P I N I O N
LEHMAN BROTHERS, INC. KENNETH N.
GOLDMAN, M.D., and DAVID M. GRUBER, M.D.,

                    Defendants.
------------------------------------------X
A P P E A R A N C E S:

Attorneys for Plaintiffs:

    McCALLION & ASSOCIATES
    24 West 40th Street, 17th Floor
    New York, NY 10018
    By:  KENNETH F. McCALLION, ESQ.
         Of Counsel

    THOMAS A. HOLMAN, ESQ.
    One Penn Plaza, Suite 2505
    New York, NY 10119

    CURTIS V. TRINKO, ESQ.
    16 West 46th Street
    New York, NY 10036

CONTINUED ON FOLLOWING PAGE

<u>Attorneys for Defendants</u>:

    JONES DAY
    222 East 41st Street
    New York, NY 10017
    By:  JAYANT W. TAMBE, ESQ.
         AVIVA S. WARTER, ESQ.
         <u>Of Counsel</u>

**Sweet, D.J.,**

Defendants Lehman Brothers Inc., Kenneth N. Goldman, M.D., and David Gruber, M.D. (collectively "Lehman" or the "Defendants") have moved pursuant to Rules 12(b)(6) and 9(b), Fed. R. Civ. P., and the Private Securities Litigation Reform Act (the "PSLRA") to dismiss the third amended complaint ("TAC" or "Complaint") of David Joffee and thirty-six other individuals, and a subchapter 5 corporation (the "Plaintiffs"). For the reasons set forth below, the motion is granted.

**Prior Proceedings**

On May 7, 2004, the Plaintiffs filed their complaint. Lehman moved to dismiss, and the Plaintiffs filed their second amended complaint. Lehman again moved to dismiss, which motion was granted by order and opinion of the Court dated June 23, 2005 (the "June 23 Opinion"), No. 04 Civ. 3507 (RWS), 2005 U.S. Dist. LEXIS 12313 (S.D.N.Y. June 30, 2005), familiarity with which is assumed. The Plaintiffs filed their TAC, which is the subject of the instant motion, on July 21, 2005.

Lehman again moved to dismiss and the motion was heard and marked fully submitted on October 5, 2005.

**The TAC**

The TAC has alleged that the Defendants failed to disclose that Lehman's research department was little more than an extension of the investment banking division (TAC ¶¶ 34-84); that misleading Lehman Reports succeeded in generating the false impression that Sunrise had greater potential for success than it actually did; that the Reports were calculated to counter the skepticism in the marketplace (prompted by the financial difficulties, under-capitalization issues challenging Sunrise, and the debate over the efficacy of Sunrise's product); and that as a result of their respective reliance on the buy recommendations and price targets in the Lehman Reports, Plaintiffs suffered losses of approximately $6.5 million in the value of their investments in Sunrise. (TAC ¶¶ 1, 9-30.) The TAC has also alleged that Defendants' misrepresentations concerning the demand for Sunrise's product and services, and their sales prospects, were the proximate cause of these losses. (TAC, ¶¶ 118-128.)

**The Rule 12(b) Standard**

The standard to be applied in the determination of a Rule 12(b)6 motion was set forth in the June 23 Opinion and is equally applicable to the instant motion.

**Lehman's Analyst Reports**

Plaintiffs allege that they suffered economic losses because they purchased Sunrise stock at artificially inflated prices in reliance on the market price of Sunrise's stock and excerpts from seven different Lehman Analyst Reports covering Sunrise and rating Sunrise's stock a "Buy" (the "Analyst Reports"). (TAC ¶¶ 96, 119.) Plaintiffs' claims rest exclusively on these Analyst Reports excerpts, which Plaintiffs allege were false and misleading because they failed to disclose the following:

- **The Shortcomings Of The Hyperion Laser** -- when the Sunrise laser device was used in accordance with the FDA-approved protocol, patients experienced side effects such as induced astigmatism, early regression, and unpredictability of vision correction. Goldman and Gruber were allegedly told about some of the laser's shortcomings by unnamed ophthalmologists in October 2000. (TAC ¶¶ 100, 102, 103).

- **The U.S. Medical Agreement** -- Sunrise and U.S. Medical corporation entered into an Agreement whereby U.S. Medical would purchase and distribute 20 Sunrise laser units in return for the purchase by Sunrise of 4% of the privately owned stock in U.S. Medical, which approximated the cost of the 20 units (TAC ¶ 103); and

- **Lehman's Interest In Sunrise** -- Lehman participated in an $11.7 million private placement for Sunrise Securities through affiliates called LBI Group, and a Lehman employee was also a Sunrise director. (TAC ¶¶ 31, 86, 87).

(The "Omitted Information"). Plaintiffs allege that together this information renders false and misleading Lehman's predictions for

3

the marketability and projected sales of Sunrise's Hyperion laser and that Lehman should have tempered its opinions and projections with warnings concerning the Omitted Information. (TAC ¶¶ 118, 126.) Each of the pieces of Omitted Information upon which Plaintiffs base their claims was publicly disclosed before Lehman ceased its coverage of Sunrise on April 3, 2001 in either: (1) Sunrise's contemporaneous filings with the SEC; (2) the Analyst Reports themselves; and/or (3) in the publicly-posted FDA letter approving the sale of Sunrise's laser device (cited at TAC ¶ 88). Plaintiffs contend that the August 20, 2000 Analyst Report stated that projected sales of Sunrise's Hyperion laser device had been increased for the second half of 2000. (TAC ¶ 96.) Plaintiffs allege that this was false and misleading on the one hand, and also allege the truth of that very allegation on the other. (Compare TAC ¶ 96 to TAC ¶ 104.) The Complaint also contains allegations concerning communications between unnamed investors and Goldman and Gruber. (See TAC ¶¶ 110-113).

The TAC alleges that Lehman was motivated to inflate its projections to induce the market to invest in Sunrise because Lehman had an investment interest in Sunrise. (TAC ¶¶ 31, 86, 87.)

Plaintiffs claim to have purchased Sunrise stock in reliance on Lehman's "predictions," anywhere from December 1999 through December 2001. (TAC ¶¶ 9-30, 120, 121.) Throughout the sixteen months that Lehman issued its Analyst Reports -- from

4

December 1999 to April 3, 2001 -- the price of Sunrise stock declined continuously to $1.75 per share. During this time, Lehman analyzed the performance of Sunrise and rated its stock a "a-Buy" with a projected target of $19 per share, with the exception of a brief period in March 2001 when Lehman dropped the Sunrise target stock price to $12 per share. (TAC ¶¶ 92, 96.) The price of Sunrise stock began to rise after Lehman ceased its coverage, and more than doubled in value by April 26, 2001. (See Tambe Decl. Ex. 3.) Thereafter, it resumed its long, slow decline until September 2002, when Sunrise filed its petition for bankruptcy.

Twenty-four out of the thirty-nine Plaintiffs nevertheless continued to purchase Sunrise stock through December 2001. (TAC ¶¶ 14, 15, 19-21, 24-30.) The Complaint fails to allege the price paid by any of the Plaintiffs for their Sunrise stock. (TAC ¶¶ 9-30.) Two of the Plaintiffs do not allege the amount of Sunrise stock purchased, but allege the amounts to be "in excess of" a stated amount. (TAC ¶¶ 12, 13.) None of the Plaintiffs maintained brokerage accounts at, i.e., were customers of, Lehman. (TAC ¶ 32.)

Plaintiffs now contend that Sunrise's stock declined because "contrary to Defendants' predictions of a growing market for Sunrise's products and the surgical procedures made possible by those products . . . demand for the surgical procedures dropped and Sunrise's product sales plummeted." (TAC ¶¶ 120, 121, 126.)

5

Plaintiffs contend that "the failure of eye-care customers' demand for the procedure" and a "failure of demand by ophthalmologists for the $200,000 laser unit," "caused the business failure of Sunrise." (Id.) Thus, Plaintiffs allege that the decreased sales of the Sunrise laser to ophthalmologists, coupled with the decreased demand for the procedure from patients, caused Sunrise's stock price to drop. (See TAC ¶ 104.) "[T]he failure of Sunrise's procedure and product caused the failure of [] Sunrise's business and the loss of value of the common stock of Sunrise, and accordingly Defendants' misrepresentations and omissions also, [] caused the investment losses complained of herein." (TAC ¶ 128.)

As detailed below, the Complaint fails to plead facts necessary to demonstrate: (a) loss causation, i.e., that Lehman's alleged misstatements and/or omissions proximately caused the decline in the Sunrise stock price; or (b) the falsity of the Analyst Reports.

### The TAC Fails Adequately To Plead Loss Causation

In the June 23 Opinion, this Court held that Plaintiffs failed to adequately allege loss causation because Plaintiffs "merely alleged that (1) Sunrise stock is publicly traded and (2) the defendants' misrepresentations falsely inflated the value of Sunrise's shares." (See June 23 Opinion at *9.) According to this Court, such allegations did not satisfy the pleading standard for

6

loss causation set forth in Dura because they failed to demonstrate the necessary causal connection between Lehman's alleged misrepresentations and omissions and Plaintiffs' alleged losses. Here again, Defendants argue that the Plaintiffs have failed adequately to allege loss causation.

To state a claim for damages under Section 10(b) and Rule 10b-5, Plaintiffs must adequately allege facts showing loss causation -- i.e., that Defendants' alleged misrepresentations and omissions caused Plaintiffs' alleged loss. See Dura Pharmaceuticals v. Broudo, 125 S. Ct. 1627, 1631 (2005) (holding mere allegations that the price paid for an equity security was inflated as a result of defendant's misrepresentation inadequate to allege loss causation); see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 196-97 (2d Cir. 2003) (same). In other words, Plaintiffs must demonstrate that "the loss [was] foreseeable and [] the loss [was] caused by the materialization of the concealed risk." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005).

The plaintiffs in Dura brought a federal securities fraud class action alleging that Dura Pharmaceuticals, Inc. misrepresented, among other things, the company's drug profits and the future approval by the FDA of Dura's asthmatic spray device, thereby inducing plaintiffs to purchase Dura securities at an artificially inflated price. Dura, 125 S. Ct. at 1630. The Supreme Court

7

rejected the Ninth Circuit's permissive pleading standard for loss causation, holding specifically that a plaintiff cannot adequately allege loss causation simply by alleging that he purchased securities at artificially inflated prices. The Court noted that:

> It should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid.

Dura, 125 S.Ct. at 1630-31.

In deciding that allegations of artificial price inflation are insufficient in and of themselves to establish loss causation, the Dura court held that "the logical link between the inflated share price and any later economic loss is not invariably strong." Dura, 125 S.Ct. 1631. That is because it may not be the misrepresentation that caused the decline in price, but instead "[a] tangle of factors affecting price," such as "changed economic circumstances, changed investor expectations, new industry-specific facts, conditions, or other events." Id. at 1632. Thus, the Court concluded that while artificial price inflation may "touch upon" a later economic loss, it cannot be said to have caused the loss. Id.

8

While Plaintiffs have now alleged that their losses were caused by a decline in demand for Sunrise products, they have failed to allege a causal connection between that decline and Lehman's representations or alleged omissions. In addition, as anticipated by the Supreme Court in Dura, here the Complaint itself offers the following new "tangle of factors affecting price": (1) a decline in demand for the Sunrise laser surgery procedure, (2) a decline in purchases of the Sunrise laser units by ophthalmologists; and (3) unsatisfactory results of the surgical procedure. (TAC ¶ 126.)

Furthermore, Plaintiffs have not alleged any disclosure of the alleged scheme of which they complain that caused the stock price to decline. See Dura, 125 S.Ct. at 1633-34; Lentell, 396 F.3d at 173; Liu, 2005 WL 11624451, at *3. Indeed, each of the matters that Plaintiffs claim Lehman failed to disclose had, in fact, been disclosed to the market in Sunrise's SEC filings, the Analyst Reports themselves, and in the FDA's letters approving the Sunrise laser for sale. (See, e.g., TAC ¶ 88, Tambe Decl. Excs. 4-11; see also June 23 Opinion at *5, n.4.) Thus, Plaintiffs cannot contend that any subsequent disclosure of the allegedly Omitted Material could have caused the decline in Sunrise's stock price.

In addition to a causal connection, loss causation requires Plaintiffs to allege facts indicating the economic loss they claim to have suffered. See Greenwald, 192 F. Supp. 2d at 226

9

(because the complaint was devoid of allegations demonstrating any disparity between what plaintiff paid for that security and whatever he would claim to have been its true value, he has not plead sufficiently a cause of action under Section 10(b) or Rule 10(b)-5); Spencer Trask Software & Info. Servs. v. Post Int'l Ltd., No. 02 Civ. 1276 (PKL), 2005 WL 1162445, at *20 (S.D.N.Y. Jan. 24, 2003) (because plaintiffs failed to allege the "nature of their recoverable damages, they were unable to establish a causal connection between certain misrepresentations and what damages there may be.").

Here, there are no allegations as to the price each Plaintiff paid for the Sunrise stock or the date on which each Plaintiff purchased the stock. As this Court recently noted in In re NYSE Specialists Sec. Litig., No. 03 Civ. 8264 (RWS), 2005 U.S. Dist. LEXIS 32597, at *84-85 (S.D.N.Y. Dec. 13, 2005), Plaintiffs are not required to separately allege the elements of their Section 10(b) manipulative scheme claim for each individual transaction. Rather, it is sufficient for a plaintiff to couple specific allegations concerning sample transactions with more general allegations concerning the conduct of the defendant. However, unlike the Plaintiffs in NYSE, many of the Plaintiffs in the instant case offer only vague allegations that they may have purchased the stock anywhere between two and eight months after Lehman declared that it had ceased issuing Sunrise Analyst Reports. (TAC ¶¶ 10, 13-15, 19-21, 24-30.) In addition, two of the

10

Plaintiffs fail to allege the amount of Sunrise stock purchased, and instead simply allege the amounts to be "in excess of" a stated amount without providing examples of specific instances. (TAC ¶¶ 12, 13.)

In opposition to Defendants' motion, Plaintiffs argue that: (i) they are not required to make any allegations connecting the Analyst Reports and the decline in sales (Opp. Br. at 7); (ii) they "have met the requirements of Emergent Capital" (id. at 6); (iii) their allegations are supported by certain pre-Dura and pre-Lentell decisions (id. at 8-9); and (iv) "an allegation of a corrective disclosure is not required." (Id. at 12-14.)

Contrary to Plaintiffs' first contention, the Second Circuit made clear in Lentell that "'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered' . . . i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Id. at 173 (citations omitted). The Lentell court went on to explain that these pleading principles "require both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk." Id. (emphasis in original).

Citing the Second Circuit's pre-Lentell decision in Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc., 343 F.3d

11

189 (2d Cir. 2003), Plaintiffs focus on the foreseeability of the consequences of the allegedly concealed risk, rather than on the Second Circuit's explicit requirement of actual loss causation. (Opp. Br. at 6-7).[1] The Second Circuit expressly rejected in Lentell an argument no different that Plaintiffs' argument here. The Court explained, "we have described loss causation in terms of the tort-law concept of proximate cause, i.e., that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation . . . but the tort analogy is imperfect." 296 F.3d at 173 (citing Emergent Capital). The Second Circuit went on to reiterate that in a securities case, to establish loss causation, a plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Id.

Plaintiffs' reliance on the Honorable Shira A. Scheindlin's decision in Fogarazzo v. Lehman Bros., Inc., 341 F. Supp. 2d 274 (S.D.N.Y. 2004) ("Fogarazzo I") to argue the contrary is misplaced because that decision (i) pre-dates Dura and the Second Circuit's extensive treatment of the loss causation requirement as applied to research analyst cases in Lentell; and (ii) is premised on Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001), which the Second Circuit

---

[1] Plaintiffs also misstate the reasoning of Emergent Capital. In Lentell, the Second Circuit itself recognized that Emergent Capital "require[d] both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk." 396 F.3d at 173 (citing Emergent Capital) (emphasis in original).

12

clarified in Emergent Capital and in Lentell. See Lentell, 396 F.3d at 173 ("Suez Equity does not purport to express this Circuit's authoritative position"). Indeed, since Dura and Lentell were issued, Judge Scheindlin has herself revisited the loss causation requirement as applied to research analyst cases in Liu v. Credit Suisse First Boston, No. MDL 1554 (SAS), 2005 WL 1529659 (S.D.N.Y. June 28, 2005). In Liu, Judge Scheindlin concluded that:

> [I]n Lentell, the court paid lip service to Suez Equity, but held that the Second Circuit "require[s] both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk." It is thus beyond cavil that Lentell requires more than the bare "proximate cause" standard asserted by plaintiffs here.

Id. at *5. Applying that reasoning to the allegations of false analyst opinions, Judge Scheindlin concluded that "where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed -- i.e., a corrective disclosure." Id. at *6.

The allegations in this case are strikingly similar to those at issue in Lentell and Liu. In both those cases, as in this case, the relevant truth about the research analyst reports, i.e., that they allegedly were not the true opinions of the analysts when made, was not disclosed, if ever, until years after plaintiffs losses were realized. See Lentell, 396 F.3d at 175, n.4 ("the falsity of Merrill's recommendations was made public no earlier than April 2002, when the NYAG's affidavit 'described the inner

13

workings of Merrill's Internet Group'"); Liu, 2005 WL 1529659, at *6.

Plaintiffs' reliance on two recent decisions in cases that did not involve analyst opinions to argue that a corrective disclosure is not always required under Lentell is also misplaced. (Opp. Br. at 13, citing Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005) and In re Parmalat Sec. Litig., 375 F. Supp. 2d 278 (S.D.N.Y. 2005). Both of those cases, however, involved alleged misrepresentations and omission of fact and not allegedly false analyst opinions. That distinction is important because, under the Supreme Court's decision in Virginia Bankshares v. Sandberg, 501 U.S. 1083, 1095-96 (1991), statements of opinion are actionable only to the extent that they are not honestly held. Thus, to plead that such statements of opinion actually caused Plaintiffs' damages, it is critical for Plaintiffs to allege that the "relevant truth," i.e., the alleged dishonesty of the opinions, is revealed to the market. See Teamsters, 2005 U.S. Dist. LEXIS 19506, at *27 (reiterating Liu analysis and distinguishing claims of factual misstatements and omissions from claims concerning false opinions). Moreover, in both cases that Plaintiffs cite, facts that were misrepresented or concealed from the market were subsequently revealed and then actually caused Plaintiffs' damages.

14

In any event, even if Plaintiffs' claims are considered as ones about undisclosed facts, as opposed to false opinions or "predictions" (TAC ¶¶ 120, 21), their own pleading demonstrates that the true facts about demand for Sunrise products never was concealed. (See TAC ¶ 104.) The Complaint refers to information in Sunrise's public filings for the entire period that Lehman covered Sunrise and states that "contrary to Defendants' misleading statements of material fact concerning projected sales . . . sales of the laser units plummeted within a year of the product's introduction, as the following chart demonstrates (based on Sunrise Technologies SEC Form 10K and 10Q)." (TAC ¶ 104). Thus, like Swack, here too a "disparity between Lehman's recommendations and [the Company's] actual performance could not have leaked out and caused damage because it was never concealed." Swack, slip op. at 8. Indeed, as in Swack, here too "the market had access to both Lehman's opinions and facts about [Sunrise] and both were, therefore, incorporated into the stock price." Id. (citing Basic, Inc. v. Levinson, 485 U.S. 224, 246-47 (1988) ("the market price of shares traded on well-developed markets reflects all publicly available information")). Indeed, these Plaintiffs admit that the market for Sunrise securities "digested all information with respect to Sunrise from all publicly-available sources and reflected such information in Sunrise's stock price." (TAC ¶ 139). Thus "if [the Analyst Reports'] discrepancies were apparent, then they were already reflected in the purchase prices [of the stock]

15

and could not have subsequently caused losses." See Swack, slip op. at 9.

Finally, Plaintiffs' Complaint contains one new allegation repeated twenty-two times throughout the Complaint: "as a direct and proximate result of Defendants' wrongful conduct," Plaintiffs were "damaged by the loss" of their investment. (See TAC ¶¶ 9-30.) This repeated allegation falls well short of what is required to demonstrate loss causation both under Rule 8 of the Federal Rules of Civil Procedure and under Dura. While Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," that "'short and plain statement' must provide the defendant with 'fair notice of what plaintiff's claim is and the grounds upon which it rests.'" Fed. R. Civ. P. 8(a)(2). As the court in Dura stated, "allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid." 125 S. Ct. at 1634 (citations omitted); see also Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1497 (2d Cir. 1992) (plaintiff's complaint failed to allege loss causation where it averred, "in a conclusory fashion . . . that 'there [was] a direct causal link between defendants' fraud and Citibank's losses,'" and "[did] not detail how the alleged fraud directly and proximately resulted" in plaintiff's damage).

16

In sum, Plaintiffs have failed to plead loss causation because they have not alleged and cannot allege that Lehman's allegedly false predictions about the demand for Sunrise products actually caused the demand for Sunrise products to decline and the stock price of Sunrise to suffer.

**Conclusion**

Based on the foregoing, Defendants' motion to dismiss the Complaint is granted.

It is so ordered.

New York, NY
January 18, 2006

ROBERT W. SWEET
U.S.D.J.